■ GRAMERCY BOYS' CLUB ASSOCIATION, INC., Respondent, v CITY OF NEW YORK et al., Appellants.—Judgment, Supreme Court, Bronx County (Aldo Nastasi, J.), entered December 16, 1986, which assessed damages against defendants in the amount of $2,175,000, plus interest and costs, for the negligent demolition of a specialty building, is reversed, on the law, the facts and in the exercise of discretion, and the matter remanded for a new trial on the issue of damages only, without costs and disbursements, unless plaintiff stipulates, within 20 days of the date of the order to be entered hereon to reduce the verdict against defendants to the principal sum of $950,000, and to the entry of an amended judgment in accordance therewith.

By a prior judgment of the Supreme Court, New York County (Irwin Silbowitz, J.), entered April 5, 1985, defendants-appellants City of New York and Department of Buildings (collectively the City) were found liable for having negligently demolished, in 1981, a building owned by plaintiff-respondent Gramercy Boys' Club Association, Inc. (Gramercy), a nonprofit corporation. At the time of the demolition, the building, located at 1637 Washington Avenue in The Bronx, had been vacant for nearly one year, due to insufficient funds to repair

extensive damage caused by vandals during a one-month vacation closing. Prior to the vandalism, Gramercy had, for nearly 25 years, used the facility to provide educational, social, and recreational services to neighborhood children.

In this appeal, the City challenges the sum awarded to Gramercy as compensation for the loss of its building.

As a threshold matter, we address whether the building was properly classified as a "specialty". In *Matter of County of Suffolk (C. J. Van Bourgondien, Inc.)* (47 NY2d 507, 512), the court set forth criteria that must be met for such a classification, citing, *inter alia,* the structure's unique and specific purpose, the special design by which the unique function is met, the lack of a market for, and sales of, such property, the appropriateness of the facility's use for its special purpose at the time of its demolition, and the reasonable expectation that it would be replaced.

The evidence presented by plaintiff's expert, a civil and structural engineer specializing in unique and specialty property, established that the Gramercy Boys' Club facility met these criteria. Originally designed and erected as a settlement house, the subject four-story brick building contained such features as a fully equipped stage with dressing rooms, stage lighting, and sound amplification equipment; a wood floor gymnasium used as a basketball court as well as for other games and activities; locker and shower rooms; a boxing ring; game rooms with ping pong and pool tables; music rooms and classrooms with blackboards; and a library. The building also had floors of inlaid tiles designed to be used for shuffleboard games, and marble stairways.

Further evidence established that Gramercy used the building for its special purpose and that, although badly vandalized, the bulding remained appropriate for such use at the time of its demolition. In addition, relevant testimony made clear that Gramercy fully intended to replace the facility in order to continue its work.

On this record, and in light of the principle that "[c]hurches, hospitals, clubhouses and like structures held by nonprofit agencies as centers for community service commonly fall within [the specialty] category" *(Matter of Rochester Urban Renewal Agency [Patchen Post],* 45 NY2d 1, 9), we conclude that the court properly deemed the demolished structure to have been a specialty building.

Having determined that the building demolished was a specialty, we now turn to the appropriate method of valuation.

It is well established that because of its unique and specific function, a specialty property has "no readily recognizable market and [that] testimony as to a fair market price is not usually available", for "[w]hile this property might be worth to the owners all that it cost, it would not be 'marketable' * * * because there is no similar group in the area which would offer to buy the [property] for its reproduction value". *(Keator v State of New York,* 23 NY2d 337, 339-340.) Thus, "the use of the fair market value approach becomes unworkable", and the rule which has evolved is that value should be determined with reference to the cost of reproduction less depreciation *(Keator v State of New York, supra,* at 339), or, where appropriate, the cost of *replacement* less depreciation. *(See, Matter of County of Suffolk [C. J. Van Bourgondien, Inc.], supra,* at 511.) Replacement, rather than reproduction, of a building is particularly appropriate where, as here, the building has structural features which would be expensive to reproduce and are not necessary to the facility's purpose. *(See, Lapides v State of New York,* 37 AD2d 755.)

In the case at bar, plaintiff presented expert testimony solely with respect to the replacement, and not reproduction, value of the building. Defendants' expert on this issue took the position that the demolished structure had no economic value whatsoever because it had been severely damaged by flooding and vandalism, and because its immediately surrounding area was largely depopulated. While we reject defendants' assessment of "zero" value, we are equally troubled by plaintiff's expert's valuation of $2,115,000 at the time of the demolition.

The record establishes that plaintiff's building had, for nearly a quarter of a century, served as a facility which provided educational, social, and recreational services to young boys and girls. Although extremely vandalized at the time of its razing, the solid brick building was structurally sound, and possessed of its specialty components. However, the record also reveals that the damage which the building sustained during the nearly year-long period it was closed was severe and extensive. This damage included missing doors, radiators, pipes, and electrical fixtures; broken windows; ripped-out plumbing and wiring; and nonfunctioning boilers.

In addition to the structure's damaged state, the nature and value of surrounding realty are helpful in fairly assessing plaintiff's loss. Defendants' evidence established that the building's immediate area had been largely depopulated, and

that only 10% of the housing which once stood within a 6-to-8-block radius was still in existence.

Given all of these circumstances, we find the award to plaintiff of $2,175,000 for the loss of its building to be so grossly excessive as to shock the conscience of the court. *(See, Matter of City of New Rochelle [Gucker]*, 305 NY 897.) Accordingly, the judgment is reversed and the matter remanded for a de novo trial on damages, unless plaintiff stipulates to a reduction to the principal sum of $950,000. Concur—Kupferman, J. P., Sullivan, Milonas and Kassal, JJ.

Asch, J., dissents in a memorandum as follows: Gramercy Boys' Club Association, Inc., the plaintiff, owned a building, on Washington Avenue in The Bronx, which the city tore down in August of 1981 because it appeared unsafe.

After a trial on the issue of liability, it was found that the defendants had failed to proceed on proper notice and were liable to the plaintiff for wrongful demolition. After a second trial on the issue of damages, the court entered judgment awarding the plaintiff club $2,175,000, plus interest and costs. It is that second judgment with which we are now concerned.

The amount which the court awarded was based on the theory that the building had only one possible use and, accordingly, its value was calculated based upon its uniqueness as a "specialty" building.

While I have no argument with the determination of the trial court that the city improperly tore down the building, study of the record establishes that the building was not in active use at the time; that, in reality, it would not and could not be restored to use if it had not been demolished; and that, as a matter of fact, it had actually been abandoned, so that its value aside from the land was nil.

Even a superficial examination of the record establishes this fact. The testimony and other evidence adduced indicate that the building itself was open, vacant and unguarded for a period of 11 months or so, before the city tore it down. During that time and perhaps for an even longer period, it was, in effect, destroyed by vandals. The Visigoths and Vandals who sacked Rome could not have done a more efficient job. Almost every window had been smashed. All sorts of garbage and other debris were scattered throughout the building. Fixtures, both lighting and plumbing, had been ripped from the walls. An evaluation of the evidence makes its clear that the club took no action to protect the premises or to seal it and, certainly, not to repair the destruction.

Mr. Lombardi and Mr. Golovchenko testified, on behalf of plaintiffs, that the building was sealed with concrete blocks. Nevertheless, it was still vandalized. Mr. Golovchenko testified that the vandals broke through the concrete in order to continue the vandalism. This testimony to prove that there was a proper sealing was incredible. Vandals would have to break through solid concrete in order to enter a derelict and already vandalized building. This building was only one of hundreds of vacant buildings in The Bronx, many of which are not properly sealed. Why vandals would breach stone walls, when other buildings nearby were open and could be entered with no effort at all, was not explained.

Further, this testimony was contradicted by the evidence presented by defendants. Both Mr. Tucciarone and Mr. Lattari testified that there was no evidence that the building had ever been sealed, and the photographs put in evidence by the city confirmed this.

Ms. Veralyne Hamilton was a member of Community Board No. 3 in The Bronx from 1973 onward. She was very much aware of what went on in that area. In 1980, she became the chairperson of the Community Board, and from 1981 through 1983 she was the district manager. Significantly, the building was within the jurisdiction of Community Board No. 3. She testified that at the request of the South Bronx Development Office, in 1980 or 1981, the Community Board included the building in a list of buildings to be demolished as part of an urban renewal plan. This list was given to the New York City Department of Housing Preservation and Development.

Ms. Hamilton also testified that she was very familiar with what went on in the building because at one time a number of community activities had taken place in it. She stated that she passed the building at least once a month but that she didn't go inside it after 1977. She also testified that, as far as she knew, no community activities took place within the building from 1978 through 1980. As a matter of fact, she stated that she never saw anyone leave or enter the building during that period.

As to be expected, the witnesses for the defendant City of New York all gave substantial testimony in support of the position that, at the time the premises were demolished, they had been abandoned. What is even more significant, however, is that even the plaintiff's witnesses supported this position. Mr. Murray Struver, who had been the paid full-time executive director of the club; Mr. Rudolph J. Lombardi, who had

been the president of the club as well as a member of the board of directors for over 30 years; and Mr. George Golovchenko, an expert in engineering, notwithstanding their testimony in support of the position of Gramercy Boys' Club, Association, Inc., in effect, to a substantial degree supported the view that the premises were vacant and abandoned at the critical point of time. It is significant that even CORE, an organization which had undertaken to pay the utility bills (but not rent) and to maintain the building, had stopped using the building and did not pay any expenses.

Mr. Jerome Jakubovitz, who testified on behalf of the city as an expert on the appraisal of the property, testified that the building had no economic value when it was demolished. He based this on the condition of the building at the time and also on the fact that the area immediately surrounding the building had been depopulated. He stated that the 36-square-block area (a "six block circumference") around the building contained only 10% of the housing that had once been there and that extensive, but less severe, abandonment existed north, south and east of this area. Mr. Jakubovitz also testified that Park Avenue is west of Washington Avenue, the street on which the building stood, and that Park Avenue is an industrial corridor lined with garages and other commercial uses. He said that Webster Avenue is west of Park, and that Webster Avenue is also industrial in character. Webster Avenue becomes residential in character approximately five blocks north of this building.

Examination of the records of Gramercy Boys' Club Association, Inc. also makes it fairly certain that the organization would not have rehabilitated the building to its prior use. The building had been purchased for $141,831 in 1961, it had an assessed valuation of $105,000 in 1981 and, most conservatively speaking, the repairs would have cost $125,000. Furthermore, the Gramercy Boys' Club was engaged in operating in other locations, and their testimony with respect to their intention to rebuild on this site was, at best, unconvincing. The testimony furnished in support of that intention should be rejected as completely implausible because it was not supported by the underlying facts and because it was simply not worthy of belief. (*Hacker v City of New York*, 26 AD2d 400, 403, *affd* 20 NY2d 722, *cert denied* 390 US 1036.)

Thus, Mr. Struver testified that he went to the building on a weekly basis. However, Mr. Struver also testified that he did not know that the building had been demolished until someone else told him about it. His account of frequent visits was

also incredible in that although he saw the building's condition worsen, he never removed whichever club records were in the building, and consequently these records were destroyed. It is inconceivable that he would not have removed these records for safekeeping. He also testified that he consulted an engineer about repairing the building but never got a single written estimate during the 11-month period of vandalism.

The building was not in active use in August of 1981, when it was demolished, and there was no showing on the record herein that it would have been returned to use if it had not been demolished. In fact, the credible evidence shows that plaintiff abandoned the building.

Consequently, the judgment herein should be modified so that plaintiff is awarded no damages.